**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**DAPHNE L. COUNTS,**

**Plaintiff,**

**v.**

**Civil Action 2:20-cv-5447
Judge Michael H. Watson
Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

**Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Daphne L. Counts, brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for social security disability insurance benefits and supplemental security income. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 15), the Commissioner's Memorandum in Opposition (ECF No. 18), Plaintiff's Reply (ECF No. 19), and the administrative record (ECF No. 14). For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I. BACKGROUND

Plaintiff protectively filed her applications for disability insurance benefits and supplemental security income in December 2016, alleging that she has been disabled since March 31, 2014, due to fibromyalgia, mental disorder, depression, and anxiety. (R. at 497-511, 555.) Plaintiff's applications were denied initially in June 2017 and upon reconsideration in September 2017. (R. at 305-376.) Plaintiff sought a *de novo* hearing before an administrative

law judge (the "ALJ"). (R. at 400-402.) Plaintiff, who was represented by counsel, appeared and testified at a hearing held on February 13, 2019, and at a second hearing held on July 10, 2019. (R. at 219-303.) A Vocational Expert ("VE") also appeared and testified. (*Id.*) ALJ Deborah F. Sanders issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act on September 26, 2019. (R. at 184-218.) The Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1-7.) This matter is properly before this Court for review.

## II. HEARING TESTIMONY

The ALJ summarized Plaintiff's statements to the agency and her relevant hearing testimony:[1]

> *** [Plaintiff] reported struggling with depression daily. She reported when she was depressed a few days in a row, she would get an additional appointment or call Netcare for spot counseling. She also reported being anxious every day and that she had panic attacks at least once a week. She reported she would get along well with people she trusted, but was wary of people and avoided strangers. She claimed to have problems remembering conversations and procedures. She also reported having trouble focusing as her mind would race and she would ruminate on things. She claimed to not finish things because she would not feel like doing them. She testified she had three or four panic attacks a day. She later testified she had five panic attacks a day. She indicated these panic attacks were small and only she noticed them. She reported she would get overwhelmed and leave the room. She indicated she would have crying spells for no reason. She claimed it would take her two days to prepare to go to an appointment as she would be overwhelmed and shut down. She testified she had flashbacks to prior trauma.
>
> As for [Plaintiff's] day-to-day activities, she reported she had stopped driving on the highway. She reported the police once had to come to her because she was frozen and could not drive. She avoided driving during rush hour or on the highway as she would get panic attacks. She claimed to have problems leaving the house as she would be scared to go outside. She indicated she did not want to go do anything. She claimed to claustrophobic and have problems with crowds and public places. She claimed she would always have a panic attack if she went out. She claimed

[1] Because Plaintiff's allegation of error pertains only to her mental impairments and limitations, the Undersigned's discussion and analysis is limited to the same.

> others would need to tell her to take a shower and that she would wear the same clothes for a few days at a time. She testified she would go three or four days without showering. She reported being very unmotivated and tired and that her kids helped do household chores. She could sometimes go to the grocery store, but not often. She testified one of her children would do the grocery shopping for her and [Plaintiff] would only shop when she felt okay. She indicated she would avoid people in the store. She testified one [of] her daughters had a mild developmental disorder and could take care of the two grandchildren. [Plaintiff] testified she had moved back with her daughter to keep an eye on things. Later, [Plaintiff] testified that she was a caregiver for both her developmentally delayed daughter and her daughter's two children. [Plaintiff] testified she had gone to a hair school in 2018, but was kicked out for attendance issues. She also testified she had tried to work a few jobs at a restaurant.

(R. at 195-196.)

## III. MEDICAL RECORDS

The ALJ summarized the relevant medical records concerning Plaintiff's mental health impairments:

> *** [I]n January 2015, she was on Valium for her anxiety. In March 2015, she reported having depression. In April 2015, she was looking to get mental health medications for her panic attacks, generalized anxiety, and seasonal depression. At that time, she was self-employed. She reported having panic attacks while driving due to prior trauma. She indicated she had difficulty getting to Dayton to see a client due to her panic attacks. She indicated medication helped her sleep. She was volunteering at a food pantry and the YMCA.
>
> In May 2015, she reported having anxiety. She reported having worsening anxiety symptoms as her children had moved back into the house. All five of her children and two young grandchildren lived with her. She reported she had been unable to work for the past three months as she had lost her psychiatrist and no longer had any Valium. She reported the only thing that helped with her anxiety and panic attacks was Valium. She reported she could not drive on the highway to visit her sister in Buffalo due to panic attacks. She was restarted on medication.
>
> In June 2015, she noticed some improvement in her mood, but was having trouble sleeping at night, even on medication. She did feel better overall. Her medications were adjusted. Later that month, she reported getting depressed due to the rainy weather. She reported a recent crying spell. She felt good and wanted to start going to church again. She was now sleeping well, but was having some nightmares.
>
> In July 2015, she reported feeling well overall, though had some diarrhea from one medication, which she wanted to stop. She denied having any mood or depressive

symptoms. Her work was going well. In December 2015, she went out to dinner with someone at a restaurant and was later assaulted. While at the hospital, she was yelling about her blood pressure. A nurse was able to calm her down and give her pain and anxiety medications.

Later that month, she reported she was doing well. She claimed she had not run out of her medication, despite her last appointment with her mental health providers being in July. She noted she likely had to take custody of her grandchild when they were born. She denied having any symptoms of depression. Her appetite and sleep were good.

In March 2016, she reported there had been a lot of stress in her life lately. Her daughter had some medical issues lately and [Plaintiff's] electricity had been shut off. [Plaintiff] reported that with all the stress she was having a panic attack, but felt this was due to everything that was happening. Her sleep was still good at night.

In May 2016, she was brought to the hospital by police. She had called in saying she wanted to kill herself and taken alcohol and Valium. She reported having a lot of family and children that she looked after. She reported having had a panic attack. She reported never being suicidal and just doing that to get attention from her family.

In July 2016, she reported having periods of anxiety where she would breathe quickly. She was trying to use her coping skills. She reported being anxious when the house is not cleaned. She did not want people babysitting a two-year-old grandchild at her home. She wanted to take time for herself. She denied having any mood symptoms. In October 2016, she was setting boundaries with her children. She denied having any mood symptoms. In December 2016, her sleep and appetite were okay. In March 2017, she reported having anxiety following her rotator cuff surgery. She reported having a panic attack after the surgery and a delirious episode where she was confused. Her sleep and appetite were fair.

In May 2017, she reported she was doing well. She was planning to work with her counselor to get her house organized and decluttered. She reported having trouble with organization and motivation. She also reported problems with her memory and would miss doses of her medications at times.

A few days later, a family member called the police because [Plaintiff] had a knife in her hand and was threatening to kill herself. When admitted, she was verbally abusing staff and yelling into the hallway. She was belligerent initially. She denied any suicidal thoughts. She would go off on tangents and no[t] answer questions. [Plaintiff] reported she had been arguing with her daughter and kicked her daughter out of the house. [Plaintiff] reported drinking some and that she was throwing things when her daughter came back to the house. She denied grabbing any knives. She reported having to sometimes take care of her twin two-year-old grandchildren. She indicated she sometimes drank excessively when her anxiety was

unmanageable. A neighbor reported her recent behavior was out of character and attributed it to her not taking her prescribed Valium. He noted she had quick mood swings when not taking that.

In July 2017, she reported her oldest daughter had moved in over a month ago and this had caused a lot of stress. That daughter was no longer living with her. [Plaintiff] reported worsening anxiety at time, but denied any lethality concerns.

In August 2017, she requested assistance with her developmentally delayed daughter and her granddaughter. [Plaintiff] reported having panic attacks out of the blue where she would get short of breath, her heart would race, and she would shake. She claimed to have short-term memory issues as she would misplace things. She claimed to only very briefly visit with people at her home due to her panic symptoms. She reported frequent conflicts with family members. She claimed to have lost previous jobs due to memory issues and difficulty completing tasks. She claimed to have low motivation and that she spent most of her time just lying on the couch. She indicated she was isolating at home and may become anxious when things were out of her control or when she had to socialize or interact with people.

In September 2017, she did not think therapy would ever help with her trauma. She reported episodes where she would lose time and be forgetful. She reported that overall[,] her medications were working. In October 2017, she was doing well that day, but was afraid that feeling would not last. She denied feeling depressed or having issues concentrating. She was going to start painting her house. She felt her medications were working well and her sleep and appetite were good.

In January 2018, she reported having an episode of depression with low motivation, low energy, was isolating. She indicated this occurred after Job and Family Services did not have paperwork indicating she was exempt from working for a year. She was able to get that taken care of, but it left her depressed.

In July 2018, she was brought to the hospital by EMS after leaving a casino. She had been shuffling her gait and was wobbly. She thought she had passed out and felt very anxious. She reported she had forgotten to take her Valium because she had been out gambling. She had also used alcohol earlier that day. She indicated she had had an anxiety attack. She had significant improvement in her anxiety while in the hospital and after getting her Valium.

Later that month, she came to the hospital from Franklin County Jobs and Services complaining of a panic attack. She reported having intermittent panic attacks while talking to her counselor and that she had two more while in route. She had been screaming and was having palpitations, anxiety, and restless. She was taking Valium three times a day and reported it did not help anymore. While at the hospital, she became very combative and anxious with a panic attack where she ran down the halls. She claimed to have had six such panic attacks that day. She was demanding medication for her panic attacks and stated if she did not get them she

would keep screaming.

In December 2018, she was the primary caregiver for her developmentally delayed daughter. It could be very stressful for [Plaintiff] at times. [Plaintiff] was in the process of moving into a new house. In April 2019, she went to the emergency room complaining of a panic attack. She reported spacing out and being combative. She reported her heart always raced during these attacks. She was screaming and running from EMS. Her family indicated she had been out of her anxiety medication, though she denied this. In May 2019, she had a panic attack after being asked to move her car and having trouble finding a family member. She was combative. She took a Valium and soon became calm and felt better.

On examination, she was alert and oriented. Her cognition was intact. Her memory was intact.

Her demeanor was average. At times, her behavior was normal. At times, she was restless and agitated. She was often cooperative. At times, she was uncooperative and suspicious of others. Her eye contact was intact. Her speech was sometimes rapid. At times, she spoke loudly or slurred her speech. At times, her speech was intact.

Her psychomotor activity was typically intact. At times, she was hyperactive. Her thought process was logical. At times, she was tangential. Her thought content was intact. She had no hallucinations or delusions. She was attentive.

She was sometimes well groomed. At times, her hygiene was intact. At times, she was disheveled. She was dressed appropriately. She had no suicidal or homicidal ideation. At times, she was depressed, constricted, tearful, anxious, fearful, hopeless, irritable, sad, silly, anxious, impulsive, or angry. At times, her mood and affect were intact. Her impulse control was sometimes intact. At times, she was impulsive. Her insight and judgment were sometimes intact. At times, her judgment was poor.

On May 15, 2017, [Plaintiff] had a consultative examination with Dr. James Tanley. She drove herself to the examination. Despite extensive and repeated questioning by Dr. Tanley, [Plaintiff] only reported having fibromyalgia and her rotator cuff repair. [Plaintiff] reported she tried to help her children. She reported she did not sleep well and her appetite was not good. She reported she got along with everybody. She was smoking half a pack of cigarettes a day. She reported she stopped working because she could not cope and had burned out. She denied doing anything to deal with the job stress. She reported having panic attacks where she would breath[e] funny and fast, her head would spin, and she felt doom and that she could not get a grasp. She reported her medications helped but did not totally do the job. She reported she would spend her time on the couch and her kids had to coax her into doing things. She could do the cooking, cleaning, and grocery shopping. She reported she liked to cook and spent a lot of time watching television,

> listening to the radio, and using the internet.
>
> On examination with Dr. Tanley, [Plaintiff] was pleasant and cooperative. Her grooming was intact. She had normal posture, gait, and general motor activity. She was not using any assistive devices. Her speech was intact. Her thoughts were coherent, relevant, and goal oriented. Her speech was intact. She had no delusions or hallucinations. She had no paranoid ideation. Her thought content was normal. Her eye contact was good. She had no suicidal or homicidal ideation. She was alert and oriented. Her recent and remote memory were intact. She was estimated to have average intellectual functioning.

(R. at 201-205 (internal citations omitted).)

## IV. ADMINISTRATIVE DECISION

On September 26, 2019, the ALJ issued her decision. (R. at 184-218.) The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2018. (R. at 190.) At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff has not engaged in substantially gainful activity since March 31, 2014, the alleged onset date. (*Id.*) The ALJ found that Plaintiff had the severe impairments of fibromyalgia, history of

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

asthma and bronchitis, history of left shoulder rotator cuff repair and mild tenosynovitis, history of arthroscopy with chondroplasty of the patella of the left knee, right knee effusion, episodic mood disorder, panic disorder, generalized anxiety disorder, and posttraumatic stress disorder (PTSD). (*Id.*) The ALJ further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 191.)

Before proceeding to Step Four, the ALJ set forth Plaintiff's residual functional capacity ("RFC") as follows:

> After careful consideration of the entire record, [the ALJ] finds that [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) to include lifting and/or carry of twenty pounds occasionally, ten pounds frequently; stand and/or walk six hours in an eight-hour workday; sit six hours in an eight-hour workday; except no pushing or pulling with the left upper extremity greater than ten pounds; occasional overhead reaching with the left upper extremity; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance and stoop; occasionally kneel, crouch, and crawl; avoid concentrated exposure to extreme cold, humidity, fumes, odors, dust, gases, poor ventilation; no exposure to unprotected heights or dangerous machinery; no commercial driving; simple routine repetitive tasks in a relatively static work environment with changes that can be explained; no strict production quotas and no fast production rate pace; occasional interaction with coworkers but no tandem or shared tasks; occasional interaction with supervisors with no over-the-shoulder supervision; occasional interaction with the public but not in a customer service capacity.

(R. at 194.) At step four of the sequential process, the ALJ determined that Plaintiff is unable to perform her past relevant work as a registered nurse, nurse consultant, nurse supervisor, and director of nursing. (R. at 209.) Relying on the VE's testimony, the ALJ concluded that Plaintiff can perform other jobs that exist in significant numbers in the national economy. (R. at 210-211.) She therefore concluded that Plaintiff was not disabled under the Social Security Act at any time since March 31, 2014, the alleged onset date. (R. at 211.)

## V. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives [Plaintiff] of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI. ANALYSIS

In her Statement of Errors, Plaintiff puts forth one assignment of error: that the ALJ violated the "treating source rule" by failing to provide good reasons supported by substantial evidence explaining why the ALJ discounted the opinions provided by Angela Johnson, M.D., Plaintiff's treating psychiatrist. (ECF No. 15 at PAGEID ## 1806-1812; ECF No. 19 at PAGEID ## 1840-1843 ("The crux of [Plaintiff's] issue is that the ALJ failed to provide good reasons supported by substantial evidence for according less than controlling weight to Dr. Johnson's opinions.").) Plaintiff specifically hones in on three opinions by Dr. Johnson, each of which was afforded either "partial" or "little" weight by the ALJ: (i) a July 13, 2017 Franklin County Employability form (the "July 2017 Opinion"); (ii) an August 24, 2017 questionnaire (the "August 2017 Opinion"); and (iii) a March 11, 2019 Franklin County Employability form (the "March 2019 Opinion"). (ECF No. 15 at PAGEID ## 1807-1808.) Plaintiff argues that "the ALJ did not adequately explain what evidence was inconsistent with Dr. Johnson's opinions, and ultimately, the ALJ did not provide good reasons supported by substantial evidence explaining why Dr. Johnson's numerous treating source opinions were being discredited." (*Id.* at PAGEID # 1808.)

In response, the Commissioner argues that "[t]he ALJ was faced with conflicting medical opinions" and "[t]he ALJ's decision should not be reversed because Plaintiff would have come to a different conclusion." (ECF No. 18 at PAGEID # 1818.) The Commissioner asserts that the ALJ properly considered all of Dr. Johnson's opinions "and ultimately concluded that they were either conclusory, inconsistent with Plaintiff's daily functioning, inconsistent with the doctor's treatment records or pertained to issues that were reserved to the Commissioner." (*Id.* at PAGEID # 1824.) The Commissioner asserts that this constituted "good reasons" for affording

Dr. Johnson's various opinions "partial" or "little" weight, and argues that Plaintiff has failed to address, or misrepresents, various elements of the ALJ's discussion which support the ALJ's conclusions. (*See id.* at PAGEID ## 1824-1834.) The Commissioner also argues that "Plaintiff has not provided a persuasive argument to counter the ALJ's determination." (*Id.* at PAGEID # 1834.)

In her Reply brief, Plaintiff concedes various points but still maintains that the ALJ failed to provide good reasons for discrediting Dr. Johnson's opinions. (ECF No. 19 at PAGEID ## 1840-1843.) For example, while Plaintiff maintains that Dr. Johnson's opinions were "fairly consistent" and argues that the ALJ was selectively cherry-picking evidence from Plaintiff's daily activities, Plaintiff concedes that "it is not necessarily incorrect of the ALJ to consider such activities" and "the ALJ was able to point to various individual instances that may have, at times, contradicted Dr. Johnson's opinions." (*Id.* at PAGEID # 1842.) Plaintiff also concedes that "there may be evidence that [Plaintiff] can exceed expectations, at times, [but] those times are limited and narrow," but ultimately concludes that "the record, as evidenced by Dr. Johnson's opinions, demonstrates that Ms. Counts is unable to sustain fulltime employment, and as such, this case should be remanded." (*Id.* at PAGEID ## 1842-1843.) The matter is thus ripe for judicial review.

As a preliminary matter, the ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 404.1527(c). The applicable regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). The ALJ generally gives

deference to the opinions of a treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . ." 20 C.F.R. § 404.1527(c)(2); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013); *Blakley*, 581 F.3d at 408.[3] If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the claimant's case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id.* Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 404.1527(c)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical

[3] "Revisions to regulations regarding the evaluation of medical evidence went into effect on March 27, 2017, and purport to apply to the evaluation of opinion evidence for claims filed before March 27, 2017." *Smith v. Comm'r of Soc. Sec.*, No. 3:18CV622, 2019 WL 764792, at *5 n.2. (N.D. Ohio Feb. 21, 2019) (citing 82 Fed. Reg. 5844-5884 (Jan. 18, 2017)). Plaintiff's claim was filed in December 2016, before the new regulations took effect. (R. at 497-511.)

opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242). There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision. *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical opinion evidence within the written decision).

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(d). Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

Here, the ALJ discussed Dr. Johnson's treatment of Plaintiff, and specifically discussed each of Dr. Johnson's opinions, as follows:

There are numerous opinions by his treating providers discussed in detail below. **None of these opinions, however, can be given controlling weight. At the very least, some of these opinions to at least some degree contradict each other. Such contradictory evidence precludes any one opinion from being "not inconsistent with the other substantial evidence".** However, some of these opinions are still somewhat persuasive. The undersigned will more specifically discuss the weight given to each treating source opinion separately below.

***

**The undersigned has considered the opinion of Dr. Angela Johnson and the undersigned gives this opinion partial weight.** She gave [Plaintiff] a Global Assessment of Functioning (GAF) score of 60. A GAF score is a clinician's rating of an individual's overall psychological, social and occupational functioning, on a scale of 0 to 100. A rating of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. GAF scores are fairly vague, in that they do not exactly explain how [Plaintiff] is limited. They also do not reflect [Plaintiff's] functioning over a longitudinal period, but rather are a snapshot of [Plaintiff's] functioning at a specific time. **While supportive of a finding of severe mental impairments, this opinion is otherwise too vague to provide much insight into her functional abilities. Thus, it is given partial weight.**

**The undersigned has considered another opinion by Dr. Johnson and also gives it little weight.** She completed a checkbox for indicating [Plaintiff] could not remember work locations and work procedures, carry out instructions, maintain attention and concentration, perform activities within a schedule, sustain an ordinary routine, and interact with the general public. She also wrote a conclusory statement that [Plaintiff] is "unable to work". The ultimate issue of determining disability is a finding reserved for the Commissioner. **As noted above, Dr. Johnson believed [Plaintiff] had only moderate symptoms or moderate difficulties according to her GAF score opinion. This is significantly inconsistent with the limitations she gives on this form. This form gives extreme limitations, suggesting no ability at all to follow instructions, interact with the public, and maintain attention and concentration. Such limitations are significantly contrary to [Plaintiff's] actual daily functioning. While she certainly reported some difficulties, she did not report complete inability at all to interact with others or concentrate. Dr. Johnson's own treatment records also did not support this degree of limitation, often showing [Plaintiff] responding positively to treatment, sometimes even denying any symptoms. Thus, this opinion is given little weight.**

**The undersigned has considered another form completed by Dr. Johnson and gives it little weight.** She indicated [Plaintiff] had difficulty remembering directions and may have to ask for clarifying directions. She noted [Plaintiff] had fair ability to maintain attention. She indicated [Plaintiff] had difficulty completing

> tasks due to anxiety and her memory problems. She indicated social interactions often lead to panic attacks and anxiety. She noted [Plaintiff] may have some difficulty with adaptation. She indicated [Plaintiff] would react poorly to pressure due to her symptoms. She indicated [Plaintiff] needed a lot of breaks and support, especially when learning new skills. She indicated [Plaintiff] would forget her work schedule and sense of time. She indicated [Plaintiff] had memory lapses. She indicated [Plaintiff] had very poor stress tolerance and limited ability to deescalate when panic set in. **As noted above, Dr. Johnson gave several opinions that were contradictory to each other. Her opinions in this form reflected self-reported symptoms reported only on her most recent visit. However, such symptoms were often not mentioned in the prior longitudinal treatment records with Dr. Johnson, who was only seeing her every few months. Such minimal treatment did not support these alleged limitations. As Dr. Johnson relied heavily on [Plaintiff's] own subjective complaints, rather than her own assessment of the longitudinal record, this form is also given little weight.**
>
> **The undersigned has considered another form by Dr. Johnson and gives it little weight.** She indicated [Plaintiff] was markedly limited remembering work locations and work procedures and interacting with the general public. She indicated [Plaintiff] had extreme limitations in carrying out instructions, maintaining attention and concentration, performing activities within a schedule, and sustaining an ordinary routine. **As noted above, this form is not consistent with the other opinions given Dr. Johnson and her treatment records. Thus, this opinion is given little weight.**

(R. at 206-208 (internal citations omitted; emphasis added).) The Undersigned finds that this analysis sufficiently sets forth good reasons for not affording Dr. Johnson's opinions controlling weight.

First, the ALJ correctly, and appropriately, noted that "some of [Dr. Johnson's] opinions to at least some degree contradict each other." (R. at 207.) For example, as the ALJ noted, the record is replete with Dr. Johnson's contradictory opinions regarding Plaintiff's ability to interact with others:

- R. at 722 (February 23, 2017 Psychiatric Evaluation): Dr. Johnson assessed Plaintiff with a Global Assessment Function ("GAF") score of 60, indicating a moderate difficulty in social or occupational functioning;[4]

---

[4] A GAF score is a "subjective determination" on a scale of 1 to 100 "that represents 'the clinician's judgment of the individual's overall level of functioning.'" *Bowman v. Comm'r of Soc.*

- R. at 927 (July 2017 Opinion): Dr. Johnson reported that Plaintiff has "No" ability to interact with the general public;
- R. at 951-954 (August 2017 Opinion): Dr. Johnson opined that social interaction "often leads to panic attacks [and] anxiety," and that Plaintiff "may have some difficulty" with adaptation;
- R. at 1280 (January 3, 2019 Diagnostic Evaluation): Dr. Johnson assessed Plaintiff with a GAF score of 60, indicating a moderate difficulty in social or occupational functioning; and
- R. at 1444 (March 2019 Opinion): Dr. Johnson reported that Plaintiff is "Markedly Limited" in her ability to interact with the general public.

(*See* R. at 206-208 (citing R. at 722, 927, 951-954, 1280, 1444).)

While it is clear that Dr. Johnson has consistently opined Plaintiff has difficulty interacting with others to some degree, her opinions regarding the extent of Plaintiff's limitations have not been consistent – even when she has given opinions within one or two months of each other. And most egregiously, as the ALJ correctly observed, Dr. Johnson's opinion that Plaintiff has "No" ability to interact with the general public is directly at odds with Dr. Johnson's own notes, scattered throughout the record, which "often show[ed] [Plaintiff] responding positively to treatment, sometimes even denying any symptoms." (R. at 207 (citing R. at 717-759, 908-919); *see also* R. at 728 ("She has noticed some improvement in mood . . . . She does feel better overall."), 732 ("She does feel good today. She wants to start going to church again."), 736 ("She denies any mood [symptoms] or depressive [symptoms]"), 740 ("She denies [symptoms] of depression"), 748 ("Denies mood [symptoms]"), 752 ("Denies mood [symptoms]"), 756 ("She

---

*Sec.*, 683 F. App'x 367, 369 (6th Cir. 2017) (citing *DeBoard v. Comm'r of Soc. Sec.*, 211 Fed.Appx. 411, 415 & 415 n.1 (6th Cir. 2006) (quoting *Wesley v. Comm'r of Soc. Sec.*, No. 99-1226, 2000 WL 191664, at *3 (6th Cir. Feb. 11, 2000))). "A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009) (quoting *Edward v. Barnhart*, 383 F.Supp.2d 920, 924 n.1 (E.D. Mich. 2005)).

plans on restarting her home business"), 912 ("She states she has been doing well").) The ALJ therefore properly concluded that Dr. Johnson's various opinions were not only internally inconsistent, but also inconsistent with Dr. Johnson's own treatment records of Plaintiff, and the Court finds that the ALJ's proffered reasons for not crediting Dr. Johnson's opinion satisfy the good reason requirement. *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 440 (6th Cir. 2010) (finding ALJ appropriately rejected treating physician opinion on the grounds that it was "too inconsistent and unclear to be helpful").

Regardless, even assuming, *arguendo*, that Dr. Johnson's opinions were internally consistent, the Undersigned could not find error with the ALJ's conclusion that Dr. Johnson's opinions were consistent with the rest of the record, most significantly including the evidence related to Plaintiff's actual level of functioning. To this end, the ALJ properly discussed the following evidence related to Plaintiff's ability to interact with others:

> The claimant had significant functioning inconsistent with her allegations. She was the primary care giver of her adult developmental delayed daughter. She was also caring for two young twin grandchildren. She had a lot of family and children she looks after. She could carry children around. This does show some degree of mental ability to be able to act as a caregiver for so many people.
>
> She was also able to do some work activity after the alleged onset date. **She was working long ten-hour days at a Waffle House. She also went to beauty school for a while and was on her feet for long hours while there.** She sometimes reported she was self-employed full time. Ultimately, these work attempts and beauty school did not work out. However, **this still showed significant functioning inconsistent with her allegations**. For instance, she was not having panic attacks every single time she left the house. **She was able to volunteer at a food pantry**. Panic attacks were often triggered by acute stressors or when she missed a dose of her medication. **She was able to go to a casino, which would require interaction with significant crowds of people**. She was able to paint her house. Her left knee did well since her February 2014 surgery. Her alleged issues with difficulty turning her neck were not supported by the medical record. Records frequently showed her pain was fairly controlled with medications and she denied any side effects. Thus, the claimant's allegations are not entirely consistent with the evidence.

(R. at 208-209 (citing R. at 695, 920, 965, 1011, 1072, 1090, 1112, 1283, 1285, 1409-1436) (emphasis added).)

In her Reply brief, Plaintiff appears to concede that with the above-cited discussion, the ALJ adequately cited other substantial evidence in the record with which Dr. Johnson's opinions were inconsistent. (ECF No. 19 at PAGEID # 1842 (Stating that "it is not necessarily incorrect of the ALJ to consider such activities" and "the ALJ was able to point to various individual instances that may have, at times, contradicted Dr. Johnson's opinions.").) While Plaintiff obviously would have preferred for the ALJ to afford Dr. Johnson's opinions controlling weight, the Court must look to whether the ALJ provided good reasons for not doing so. 20 C.F.R. § 404.1527(c)(2). Here, because the ALJ properly recognized that Dr. Johnson's numerous opinions are both self-contradictory and independently inconsistent with numerous pieces of substantial evidence throughout the record, the Undersigned finds that the ALJ provided good reasons for discounting Dr. Johnson's opinions. *Moore v. Comm'r of Soc. Sec.*, No. 2:18-CV-00511, 2019 WL 3491267, at *8 (S.D. Ohio Aug. 1, 2019), *report and recommendation adopted*, No. 2:18-CV-511, 2019 WL 3944750 (S.D. Ohio Aug. 21, 2019) (finding "[t]he ALJ properly afforded only little weight" to a treating physician's opinions where the opinions "contradicted [the treating physician's] own treatment notes, medical evidence from other providers, and Plaintiff's own self-reports"). Plaintiff's assignment of error is therefore not well taken.

## VII. CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits, the ALJ's decision was made pursuant to proper legal standards, and the result is supported by substantial evidence. Based on

the foregoing, it is therefore **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED** and that the Commissioner's decision be **AFFIRMED.**

## VIII. PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report an\d Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816*,* 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date: January 3, 2022

/s/ *Elizabeth A. Preston Deavers*
Elizabeth A. Preston Deavers
United States Magistrate Judge